UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

| | |
|---|---|
| KAMEPHIS PEREZ,<br><br>                                   Plaintiff,<br>            v.<br><br>THE CITY OF NEW YORK; ERIC GONZALEZ; MARITZA MEJIA-MING; TIA-RENEE FRANKLIN; and JOHN DOES #1-5,<br><br>                                  Defendants. | **MEMORANDUM AND ORDER**<br>23-cv-6253 (LDH) (RML) |

LaShann DeArcy Hall, United States District Judge:

Kamephis Perez ("Plaintiff") brings this action against the City of New York (the "City"), Eric Gonzalez, Maritza Mejia-Ming, Tia-Renee Franklin, and John Does 1-5 (the "Defendants") pursuant to Section 1983 and New York state law, alleging unlawful retaliation in violation of New York Civil Service Law § 75-b, the First and Fourteenth Amendments of the U.S. Constitution,[1] and Article I, Section 8 of the New York State constitution. Defendants move pursuant to Federal Rule of Civil Procedure 12(b)(6) to dismiss all claims against them.

## BACKGROUND[2]

Plaintiff was hired as Special Counsel to Defendant Eric Gonzalez, Kings County District Attorney, in September 2019. (Compl. ¶ 77, ECF No. 1.) In this role, Plaintiff was responsible for leading a team of immigration attorneys, assisting the Kings County District Attorney's Office ("KCDAO") with a lawsuit against U.S. Immigration and Customs Enforcement ("ICE")

---
[1] Plaintiff clarifies that he is not asserting a Fourteenth Amendment Equal Protection claim or a Fourteenth Amendment retaliation claim. (Pl.'s Opp. to Mot. Dismiss ("Pl.'s Opp.") at 25 n.6, ECF No. 18.) Rather, his reference to the Fourteenth Amendment in his complaint "reflects the basic principle that the Fourteenth Amendment is the vehicle by which the First Amendment applies to state actors like Defendants." (*Id*.)

[2] The following facts are taken from the complaint and are assumed to be true for the purpose of deciding the instant motion.

1

regarding ICE's policy of conducting immigration arrests inside New York state courthouses (the "ICE Litigation"), and collaborating with the KCDAO's Conviction Review Unit, the Law Enforcement Accountability Unit, the Human Trafficking Task Force, and the Special Victims Bureau. (*Id.* ¶¶ 29, 80.) In February 2020, Plaintiff circulated a detailed memo to Defendant Gonzalez and several others in the KCDAO setting forth his belief that one of Defendant Gonzalez's key immigration initiatives was unconstitutional. (*Id.* ¶¶ 83–84.) Shortly after, Plaintiff was transferred to the Civil Litigation Bureau, where he worked exclusively on the ICE Litigation. (*Id.* ¶ 87.) However, Plaintiff's concerns about the immigration initiative were never addressed. (*Id.* ¶ 85.)

While working on the ICE Litigation, Plaintiff reported to his superiors that an important filing by the KCDAO contained materially inaccurate data. (*Id.* ¶ 88.) Approximately a week after reporting this issue, Plaintiff was informed by Defendant Maritza Mejia-Ming, Chief of Staff to Defendant Gonzalez, that the KCDAO no longer wanted him to work on the ICE Litigation. (*Id.* ¶ 90.) In June 2020, Plaintiff was reassigned to the KCDAO's *Giglio* Unit, where he was tasked with compiling complaints against NYPD officers. (*Id.* ¶¶ 91–92.)

In February 2021, Plaintiff was assigned to the KCDAO's Appeals Bureau, where he represented the state in criminal appeals. (*Id.* ¶¶ 96–98.) Plaintiff was not trained specifically on identifying, investigating, or disclosing *Brady* issues that arose at the trial level—nor was he informed that these were part of his official duties. (*Id.* ¶¶ 100, 132.)

**The Hay Appeal**

In May 2021, Plaintiff was assigned to work on an appeal filed by Rashan Hay (the "Hay Appeal"), a defendant who had been convicted in August 2016 of burglary, attempted rape, attempted assault, and unlawful possession of marijuana. (*Id.* ¶¶ 102–03.) The prosecutors on

the case were Assistant District Attorney ("ADA") Alanna Tierny and ADA Kevin O'Donnell. (*Id*. ¶¶ 104–05.) The principal evidence at Hay's trial was the testimony of the victim, who testified that she and Hay had previously been in a relationship, but that the relationship ended, and she had not communicated with Hay for months prior to the assault. (*Id*. ¶¶ 106–09.) Hay also testified. (*Id*. ¶ 110.) Contrary to the victim's testimony, Hay testified that he and the victim were dating at the time of the incident, that they had been frequently in contact, and that he did not assault her. (*Id*. ¶¶ 110–12.) Hay was ultimately convicted and sentenced to ten years in prison. (*Id*. ¶¶ 113–14.) He subsequently appealed, challenging, among other things, the sufficiency of the evidence against him. (*Id*. ¶¶ 115–16.) Hay did not raise any *Brady* issues. (*Id*. ¶ 116.)

In preparing to respond to Hay's appeal, Plaintiff reviewed the case file and discovered that the prosecutors failed to produce to the defense phone records indicating that the victim made and received several calls to and from Hay in the days leading up to the assault. (*Id*. ¶ 118.) These calls contradicted her trial testimony and could have been used to impeach her. (*Id*. ¶¶ 118–27.) Plaintiff reported this failure to his supervisor, ADA Jodi Mandel, who reacted to his report with "hostility" and instructed him to contact ADA Tierney. (*Id*. ¶¶ 128, 133–34.) On June 3, 2021, Plaintiff contacted ADA Tierney, who informed Plaintiff that she had no recollection of producing the call log. (*Id*. ¶ 136.) Tierney also revealed to Plaintiff other relevant information that had not been disclosed to the defense, including that the prosecution needed a material witness warrant to get a key witness to testify at trial and that the next-door neighbor who testified about hearing the struggle between Hay and the victim suffered from "auditory hallucinations." (*Id*. ¶ 137.) In addition, Tierney informed Plaintiff that, ADA Tierney and an investigator posed as a married couple to gain entry into the victim's maternity ward to

3

convince her to testify, which Plaintiff avers violated the New York Rules of Professional Conduct. (*Id*. ¶¶ 136–37.) Plaintiff reported these additional *Brady* violations to his supervisor and was told that the KCDAO would investigate the issue. (*Id*. ¶¶ 140–41.) In light of the KCDAO's investigation into the *Brady* issues, the KCDAO sought an extension of its deadline to file its appellate brief. (*See id*. ¶ 142.) Plaintiff was advised by his supervisor, ADA Anthea Brufee, to mislead opposing counsel regarding why the extension was required, but Plaintiff refused to do so. (*Id*. ¶¶ 142–43.)

On June 16, 2021, KCDAO's Chief Assistant Nancy Hoppock convened a meeting with Plaintiff, ADAs Mandel, Tierney, O'Donnell, and Bruffee, and the Chief of the KCDAO's Special Victims Unit to discuss the *Brady* issues reported by Plaintiff. (*Id*. ¶¶ 144–45.) Hoppock stated that she agreed that the failure to produce the call log amounted to a *Brady* violation and the group discussed how to go about producing the evidence to the defense in the course of the appeal. (*Id*. ¶¶ 148–49.) On July 26, 2021, Plaintiff contacted the New York State Bar Association to inquire about his ethical obligations under the circumstances and was informed that, as a general matter, any lawyer is obligated to disclose *Brady* violations that they know of and that they should do so "in a manner most meaningfully likely to remediate the issue." (*Id*. ¶¶ 153–55.) On June 28, 2021, Plaintiff was informed by Hoppock that the KCDAO would disclose the call log to the defense with significant redactions, but that the additional issues Plaintiff raised were insufficiently corroborated. (*Id*. ¶¶ 156–57.) Plaintiff was also informed that he was a material witness in the case and that his name would also be disclosed to the defense in the Hay appeal. (*Id*. ¶¶ 159–60.) Plaintiff was ordered to cease his work on the Hay appeal. (*Id*. ¶¶ 161–62.)

After concluding his work on the appeal, Plaintiff did not recall receiving any further information about the Hay matter and was not aware of whether the information was ever actually produced. (*Id*. ¶¶ 163–65.) To Plaintiff's knowledge, ADA Tierney did not receive any disciplinary action for the violation, the violation was not brought to the attention of any other KCDAO prosecutors, and no additional trainings on *Brady* violations were held as a result of this discovery. (*Id*. ¶¶ 166–68.) Hay's conviction was affirmed by the Appellate Division, Second Department on July 27, 2022, and Plaintiff is of the belief that the *Brady* issue was never brought to that court's attention. (*Id*. ¶ 169.) Despite repeated requests for more work, Plaintiff experienced "significant gaps in work assignments" following his removal from the Hay appeal. (*Id*. ¶ 170.)

**The Armstrong Appeal**

In March 2022, Plaintiff was assigned to work on the appeal of Lionel Armstrong, a defendant who had been sentenced to 25 years to life after being convicted in November 2018 of attempted murder and menacing. (*Id*. ¶¶ 171–72.) Armstrong was prosecuted by ADA Charles Guria, who, according to the complaint, had "immense influence and power within the KCDAO" and a "lengthy history of misconduct," including previous *Brady* violations. (*Id*. ¶¶ 174–78.) Armstrong's appeal did not raise *Brady* issues. (*Id*. ¶¶ 173.) However, in Plaintiff's review of the Armstrong case file, Plaintiff discovered that ADA Guria had failed to produce to Armstrong an NYPD DD-5 "complaint follow-up form" that memorialized a pre-trial interview of one of the witnesses whose 911 call was played for the jury at trial. (*Id*. ¶¶ 180–89.) The form indicated that, following the 911 call, the witness told the NYPD key information that was inconsistent with the information provided on the 911 call. (*Id*.) Plaintiff also found another unproduced

5

document in the Armstrong file that contradicted the testimony of another trial witness. (*Id*. ¶¶ 190–91.)

On March 21, 2022, Plaintiff reported these *Brady* violations to his supervisors ADA Mandel and ADA Sholom Twersky, who each also have a history of committing *Brady* violations. (*Id*. ¶¶ 192–93.) Plaintiff also disclosed the issue to ADA Guria directly, who provided no indication that the documents had been produced to the defense. (*Id*. ¶¶ 196–97.) On April 5, 2022, ADA Twersky informed Plaintiff that he spoke to ADA Guria and that, although he was unable to confirm that he produced the DD-5 form, he "firmly believed that he would have disclosed it." (*Id*. ¶ 200.) ADA Twersky did not offer to take any remedial steps or to investigate the issue further. (*Id*. ¶ 203.) That same day, Plaintiff sent an email to ADA Twersky expressing his disagreement with the conclusion that no *Brady* violation took place. (*Id*. ¶¶ 204–05.) Plaintiff received no response to his email but was later informed that the Armstrong matter had been referred to the KCDAO's Conviction Review Unit. (*Id*. ¶¶ 206–07.) Plaintiff was not informed of any subsequent investigation into the issue. (*Id*.) To Plaintiff's knowledge, ADA Guria did not face any discipline in relation to this violation and the matter was not brought to the attention of any other KCDAO prosecutors. (*Id*. ¶¶ 209–11.) Armstrong's conviction and sentence were affirmed by the Appellate Division, Second Department on November 16, 2022. (*Id*. ¶ 213.)

**Plaintiff's Termination from the KCDAO**

On May 24, 2022, Plaintiff discovered that he had been locked out of his work email account and was told by an HR representative to report to Defendant Mejia-Ming's office, where he met with Defendants Mejia-Ming and Tia-Renee Franklin, KCDAO's Deputy Director of Employee Services. (*Id*. ¶¶ 214–17.) At the meeting, Defendant Mejia-Ming acknowledged that

she was not typically involved in human resources matters. (*Id*. ¶ 218.) Plaintiff was informed by Defendant Mejia-Ming that he was being suspended without pay while the office investigated discrepancies in his timecards. (*Id*. ¶¶ 219–22.) Plaintiff denied committing any misconduct with respect to his timecards. (*Id*. ¶ 226.)

On July 6, 2022, Plaintiff received a call from Defendant Franklin and another individual, Tesha Kellman Martin, who informed him that the inconsistencies in his timecards were substantiated and that he was being terminated as a result. (*Id*. ¶¶ 228–29.) Defendant Franklin refused to disclose further details of the investigation to Plaintiff and informed him that the decision to terminate him was made by the "executive team." (*Id*. ¶¶ 230–34.) Ms. Martin informed Plaintiff that his timesheets reflected that he was in the office on days where there was no indication that he was in the office. (*Id*.) Plaintiff denied any wrongdoing and reminded Defendant Franklin and Ms. Martin of his recent *Brady* violation reports. (*Id*. ¶¶ 232, 235.)

Plaintiff contends that the timecard discrepancy, occurring just weeks after his report of the *Brady* violations in the Armstrong appeal, was a pretextual basis for terminating him in retaliation for his reports of *Brady* violations by KCDAO prosecutors. (*Id*. ¶¶ 240–41.) Plaintiff alleges that his time-keeping practices were in line with the way he had generally been instructed to keep time when he began working with the KCDAO, and in line with the practices of other salaried employees at the KCDAO. (*Id*. ¶¶ 242–46, 258.) Because Plaintiff was salaried, his compensation was not impacted by what he reported on his timecard and he was simply expected to work seven hours per workday, which he did. (*Id*. ¶¶ 245–46.) As such, Plaintiff's timecards, which had been regularly approved throughout the years that he worked for the KCDAO, reflected the total number of hours that he worked without regard for the actual times that he worked. (*Id*.) Plaintiff alleges that no other employee had been disciplined for similar time-

keeping practices and that his supervisors never voiced any concern about his time-keeping practices prior to his report of the *Brady* violations. (*Id*. ¶¶ 250–54.) Plaintiff was not offered an opportunity to view, explain, or rectify the alleged discrepancies prior to his suspension and termination. (*Id*. ¶¶ 261–62.)

## STANDARD OF REVIEW

To withstand a Rule 12(b)(6) motion to dismiss, a complaint "must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)). A claim is facially plausible when the alleged facts allow the court to draw a "reasonable inference" of a defendant's liability for the alleged misconduct. *Id*. While this standard requires more than a "sheer possibility" of a defendant's liability, *id*., "[i]t is not the Court's function to weigh the evidence that might be presented at trial" on a motion to dismiss. *Morris v. Northrop Grumman Corp.*, 37 F. Supp. 2d 556, 565 (E.D.N.Y. 1999). Instead, "the Court must merely determine whether the complaint itself is legally sufficient, and, in doing so, it is well settled that the Court must accept the factual allegations of the complaint as true." *Id*. (citations omitted).

## DISCUSSION

### I. First Amendment Retaliation Claim

To state a First Amendment retaliation claim, Plaintiff must establish that: "(1) his speech or conduct was protected by the First Amendment; (2) the defendant took an adverse action against him; and (3) there was a causal connection between this adverse action and the protected speech." *Cox v. Warwick Valley Cent. Sch. Dist.*, 654 F.3d 267, 272 (2d Cir. 2011). Defendants argue that Plaintiff fails to state a claim for First Amendment retaliation because he does not

allege that he engaged in speech protected by the First Amendment. (Mem. of L. in Supp. of Defs.' Mot. to Dismiss ("Defs.' Mem.") at 16–21, ECF No. 17.) Specifically, Defendants contend that Plaintiff's reporting of *Brady* violations in connection with the Hay and Armstrong appeals, which he oversaw, is not protected by the First Amendment because such reporting was made pursuant to his official duties. (*Id*.) The Court agrees.

It is axiomatic that a plaintiff cannot sustain a claim for First Amendment retaliation where the plaintiff's alleged speech or conduct is not protected by the First Amendment. *See Cox*, 654 F.3d at 272. Speech by a public employee is not protected by the First Amendment if either (1) the speech is made pursuant to the employee's official duties or (2) the speech is not regarding a matter of public concern. *Weintraub v. Board of Educ. of City Sch. Dist. of New York*, 593 F.3d 196, 201 (2d Cir. 2010). Of particular relevance here, when an employee's speech is made pursuant to their employment responsibilities, "the Constitution does not insulate their communications from employer discipline . . . even when the subject of an employee's speech is a matter of public concern." *Ross v. Breslin*, 693 F.3d 300, 305 (2d Cir. 2012) (first citing *Garcetti v. Ceballos*, 547 U.S. 410, 421 (2006); then citing *Jackler v. Byrne*, 658 F.3d 225, 237 (2d Cir.2011); and then citing *Anemone v. Metro. Transp. Auth.*, 629 F.3d 97, 115–16 (2d Cir.2011)). Thus, when a court finds that a public employee was speaking pursuant to their official duties, it need not examine whether that speech pertained to a matter of public concern. *Weintraub*, 593 F.3d at 201. Therefore, in determining whether Plaintiff sufficiently pleads a First Amendment retaliation claim, this Court begins by assessing whether his speech was made pursuant to his official duties as an attorney in the KCDAO's Appeals Bureau.

It is true that there is not always a clear line between speech made pursuant to an employee's official duties and that which is made as a citizen. *Portelos v. City of New York*, No.

12-CV-3141, 2016 WL 11469183, at *4 (E.D.N.Y. Aug. 13, 2016). As such, "[t]he inquiry into whether a public employee is speaking pursuant to [their] official duties is not susceptible to a brightline rule." *Ross*, 693 F.3d at 306. Instead, this inquiry is "a practical one" in which "courts must examine the nature of the plaintiff's job responsibilities, the nature of the speech, and the relationship between the two." *Id*. (citations omitted). Specifically, the Court's analysis must focus on whether Plaintiff's speech was "part-and-parcel" of "his ability to properly execute his duties." *Weintraub*, 593 F.3d at 203 (quoting *Williams v. Dallas Indep. Sch. Dist.*, 480 F.3d 689, 694 (5th Cir. 2007)) (internal quotation marks omitted).

There can be no question that Plaintiff's reports of purported *Brady* violations in the Hay and Armstrong cases were made pursuant to his official duties as the attorney responsible for responding to these appeals. According to the complaint, Plaintiff uncovered *Brady* violations in the course of his review of the trial files for both the Hay and Armstrong appeals and subsequently reported these violations to his supervisors. (*See* Compl. ¶¶ 118–211.) As Defendants argue, and as Plaintiff concedes, this reporting is squarely in line with Plaintiff's professional duty as an attorney to "disclose *Brady* violations that he knows about . . . in a manner most meaningfully likely to remediate the issue." (*Id*. ¶ 155; Defs.' Mem at 17–21.) Indeed, pursuant to the New York Rules of Professional Conduct, prosecutors have a legal obligation to disclose "new, credible and material evidence creating a reasonable likelihood that a convicted defendant did not commit an offense of which the defendant was convicted" within a reasonable time of discovery. *See* N.Y. R. Prof. Conduct 3.8(c).

Notwithstanding, Plaintiff contends that his *Brady* violation reports were not made pursuant to his official duties because, although disclosing *Brady* violations is a "general ethical obligation" that applies to all attorneys, it was not explicitly part of his job responsibilities as an

10

attorney with the Appeals Bureau. (*See* Pl.'s Opp. at 15–24.) To support this contention, Plaintiff directs the Court to allegations that (1) the defendants in the Armstrong and Hay appeals did not, and could not, raise potential *Brady* issues, (2) the KCDAO did not explicitly train or direct him to investigate and disclose *Brady* issues in connection with his role in the Appeals Bureau, and he did not view such a report as part of his duties as an appeal lawyer, (3) he was compelled to disclose the Brady issues "as a concerned citizen and as an attorney" rather than as part of his job responsibilities or as an employment-related grievance, (4) he viewed the issue as a "matter of public concern," and (5) the KCDAO fired him for making the *Brady* disclosures, illustrating its view that such disclosures were not part of his duties. (*Id*. at 19.) None of these allegations support a conclusion that Plaintiff's *Brady* violation reporting was outside the scope of his official duties. Indeed, such a conclusion would be contrary to the law.

Courts have long been advised against construing a public employee's official duties too narrowly. *Weintraub*, 593 F.3d at 202–03 (citing *Garcetti*, 547 U.S. at 424–25). Consistent with that mandate, the Second Circuit has found that speech can be made pursuant to a public employee's official job duties even where "it is not required by, or included in, the employee's job description, or [made] in response to a request by the employer." *Weintraub*, 593 F.3d at 203. As the Supreme Court noted in *Garcetti*, "[f]ormal job descriptions often bear little resemblance to the duties an employee actually is expected to perform." 547 U.S. at 424–25; *see also White v. City of New York*, No. 13-cv-7156, 2014 WL 4357466, at *10 (S.D.N.Y. Sept. 3, 2014) ("Arguments that job responsibilities do not expressly encompass the speech in question are particularly unpersuasive.") (collecting cases). It should be unsurprising, therefore, that "speech that government employers have not expressly required may still be pursuant to official duties, so

11

long as the speech is in furtherance of such duties." *Weintraub*, 593 F.3d at 202 (quoting *Williams*, 480 F.3d at 694) (internal quotation marks omitted).

Indeed, courts have routinely held that a plaintiff's speech is part-and-parcel of their job responsibilities when such speech is made pursuant to the duties inherent to the plaintiff's role. *See, e.g., Portelos*, No. 12-CV-3141, 2016 WL 11469183, at *5 (E.D.N.Y. Aug. 13, 2016) (holding that a plaintiff's speech was part-and-parcel of his job responsibilities because the plaintiff, a teacher, had "an irrefutable obligation" as a member of the School Leadership Team to report budgetary inconsistencies and issues with a comprehensive education plan, despite the fact that the plaintiff's job description did not expressly require him to raise such concerns); *Fierro v. City of New York*, No. 20-CV-09966, 2022 WL 428264, at *5 (S.D.N.Y. Feb. 10, 2022) (holding that a plaintiff's reports of physical and verbal abuse of students fell "squarely within his duty as an assistant principal to protect his students"); *Verdi v. City of New York*, 306 F. Supp. 3d 532, 548 (S.D.N.Y. 2018) (holding that a plaintiff's speech was part-and-parcel of his duties as an assistant principal where the speech "constituted advocacy on behalf of his students and putative students"). Here, there is simply no credible argument that Plaintiff's speech was not "part-and-parcel" of his duties as an appellate lawyer at the KCDAO. [3]

---

[3] *Matthews v. City of New York*, relied upon by Plaintiff, does not change the Court's conclusion. 779 F.3d 167 (2d Cir. 2015). In *Matthews*, a police officer brought a First Amendment claim against the City of New York and the New York City Police Department ("NYPD"), alleging that he was retaliated against after he reported that a quota system mandating the number of arrests, summons, and stop-and-frisks that police officers must conduct resulted in police officers violating the law and engaging in unjustified stops. *Id*. at 169–71. There, the Second Circuit rejected Defendants' argument that the plaintiff's speech was made pursuant to his official duties because he had a general duty as a police officer to report violations by fellow officers. *Id*. at 174–75. The court found that the police officer's speech was protectable under the First Amendment because "he was not identifying individual violations," but rather, he voiced concerns about a precinct-wide policy that was incentivizing violations by officers. *Id*. at 174. "Such policy-oriented speech was neither part of his job description nor part of the practical reality of his everyday work." *Id*. at 174. Unlike the plaintiff in *Matthew*, Plaintiff alleges that he identified and reported individual *Brady* violations related to the Hay and Armstrong appeals. (*See* Compl. ¶¶ 128, 133, 192.) Plaintiff does not allege that there was a formal policy by the KCDAO to engage in *Brady* violations, let alone that he engaged in speech challenging such policy. Plaintiff reported the *Brady* violations because it was his duty to do so and, as such, his speech was not protectable under the First Amendment.

Plaintiff's allegations that he was motivated "as a concerned citizen" and that his reporting of *Brady* violations was a matter of public concern also cannot sustain his First Amendment retaliation claim. (*See* Pl.'s Opp. at 15–24.) Plaintiff's alleged motivation for making the speech has no bearing on whether that speech was made pursuant to his official duties. *See Williams v. Bd. of Educ., City of Buffalo*, 519 F. App'x 18, 19 (2d Cir. 2013) (holding that "[n]o reasonable jury could conclude that [a plaintiff] was speaking as a citizen and not as an employee pursuant to her job duties" where "[r]egardless of her internal motivations, [the plaintiff's] speech was clearly undertaken in the course of performing her work." (citing *Weintraub,* 593 F.3d at 203)). Therefore, even if Plaintiff believed his report to be a "matter of public concern," the fact that he was speaking pursuant to his official duties precludes his First Amendment retaliation claim. *See Ross*, 693 F.3d at 305.

Lastly, Plaintiff's allegation that KCDAO fired him for his *Brady* violation reports cannot support his First Amendment retaliation claim because "[r]estricting speech that owes its existence to a public employee's professional responsibilities does not infringe any liberties the employee might have enjoyed as a private citizen." *Garcetti*, 547 U.S. at 411. Therefore, even if Plaintiff's termination somehow indicated that the KCDAO did not view the reporting of *Brady* issues as part of his job description, the fact that such reporting is part of Plaintiff's professional responsibility as an attorney and prosecutor is nonetheless sufficient to establish that it was part-and-parcel of his official duties. *See id*.

For the above reasons, Plaintiff fails to state a claim for First Amendment retaliation and this claim must be dismissed.

## II. New York State Law Claims

Having concluded that Plaintiffs failed to state any federal claims, it is within the Court's discretion not to exercise pendent jurisdiction over the state law claims. *Kolari v. N.Y. Presbyterian Hosp.*, 455 F. 3d 118, 121–22 (2d Cir. 2006) (quoting 28 U.S.C. § 1367(c)(3) ("If the federal law claims are dismissed before trial . . . the state claims should be dismissed as well."); *see also Jones v. Cnty. of Suffolk*, 236 F. Supp. 3d 688, 702 (E.D.N.Y. 2017); *Eubanks v. Hansell*, No. 22-CV-6277, 2024 WL 1308672, at *12 (E.D.N.Y. Mar. 26, 2024) ("[B]ecause Plaintiffs have failed to allege a viable federal claim, it would 'exceed [the] allowable discretion' of the Court to assert supplemental jurisdiction." (citation omitted)). As such, the Court declines to exercise jurisdiction over Plaintiff's claims brought pursuant to New York Civil Service Law § 75-b and Article I, Section 8 of the New York State constitution. Accordingly, Plaintiff's claims under New York state law must be dismissed for lack of subject matter jurisdiction.

## CONCLUSION

For the foregoing reasons, Defendants' motion to dismiss the complaint is GRANTED.

SO ORDERED.

Dated: Brooklyn, New York
       March 28, 2025

/s/ LDH
L SHANN D ARCY HALL
United States District Judge